UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

GARY WILLIAMS,
                                            04-CV-0471
                                            06-CV-5085
                            Plaintiff,      (CPS)(SMG)

        - against -                         MEMORANDUM
                                            OPINION AND
BRITISH AIRWAYS, PLC,                       ORDER


                            Defendant.

-------------------------------------------X

SIFTON, Senior Judge.

        Plaintiff Gary Williams ("Williams") brings the first of the

above captioned actions (04 CV 0471) against British Airways, PLC

("BA") alleging that defendant: (1) discriminated against him due

to his disability in violation of the Americans with Disabilities

Act, 42 U.S.C. § 12101 *et seq* ("ADA"); and (2) discriminated

against him and created a hostile work environment due to his

race and national origin, and retaliated against him for his

complaints of discrimination in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* ("Title VII")

and 42 U.S.C. § 1981.[1]  In a second action (06 CV 5085) against

---

[1] Plaintiff also alleged in his complaint that BA wrongfully denied him
leave in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601
*et seq*, but now states that he does not oppose defendant's motion to dismiss the
FMLA claim because "he cannot demonstrate that he worked 1250 days within the
twelve months prior to applying for family medical leave."  Plaintiff's Memorandum
in Opposition to Motion for Summary Judgment, p. 2.  Accordingly, plaintiff's FMLA
claim is dismissed.
        Plaintiff originally brought this action (04 CV 471) against defendants
British Airways, PLC, Daniel Driscoll, Doug Caines, Sandra Matusz, Sarah Jones,
and Joe Brooks, alleging claims under Title VII of the Civil Rights Act (42 U.S.C.
§ 2000e *et seq*), 42 U.S.C. § 1981, the Americans with Disabilities Act (42 U.S.C.

BA, plaintiff alleges, in addition to the federal claims described above, state claims of discrimination based on race and disability and retaliation under New York Executive Law § 296 *et seq.*[2]

Currently before the Court is plaintiff's unopposed motion to consolidate plaintiff's two separate actions against BA pursuant to Federal Rule of Civil Procedure 42(a). Also before the Court is defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, plaintiff's motion to consolidate the action is granted,[3] and summary judgment is granted in favor of defendant on

---

§ 12101 *et seq*), and under the Family and Medical Leave Act (29 U.S.C. § 2601 *et seq*). Plaintiff also brought state claims against defendants under the New York State Human Rights Law ("NYSHRL") (N.Y. Exec. Law § 290 *et seq*) for libel and for intentional or negligent infliction of emotional distress. *See* Complaint, pp. 14-25, Feb. 2, 2004.
    On June 22, 2004, I granted in part and denied in part defendants' motion to dismiss the complaint. I dismissed all the state claims and allowed plaintiff to proceed with his claims under the ADA, FMLA, Title VII, and 42 U.S.C. § 1981 against defendant British Airways. Plaintiff subsequently withdrew his Title VII and ADA claims against the individual defendants. On July 7, 2004, the complaint's caption was amended, naming British Airways as the only defendant in this case.

    [2] Plaintiff's first action was commenced on February 2, 2004. After defendant terminated plaintiff's employment in September 2005, plaintiff filed a complaint with the EEOC alleging that his termination constituted discrimination and retaliation. The EEOC issued a Notice of Right to Sue on June 22, 2006. Because defendant did not consent to plaintiff's amending his complaint to include the claims related to his termination, plaintiff filed his second action on September 16, 2006 against BA under docket number 06-CV-5085.

    [3] Federal Rule of Civil Procedure 42(a) provides that

> [w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

Fed. R. Civ. Proc. 42(a).
    Defendant does not oppose plaintiff's motion to consolidate. Because the two actions involve common questions of fact and law, and in the interests of

all claims in both actions.

## BACKGROUND

The following facts are drawn from the parties' depositions, affidavits, exhibits, and Local Rule 56.1 statements. Disputes are noted.

Plaintiff Gary Williams is a black male of Jamaican origin who was hired as a telephone sales service assistant by defendant British Airways in November 1990. BA is an international air carrier with a principal office and place of business in Jackson Heights, New York.

In 1991, Williams became a Customer Service Agent for BA at John F. Kennedy International Airport ("JFK Airport"). "Customer service involves the departure and arrival process, the check-in process, the lounges, baggage service, operations, load control, special services agents, ticketing." Def. Exh. E, Dep. of Douglas Caines ("Caines"), BA Customer Service Director, p. 11.

Plaintiff alleges several workplace incidents involving race during the 1990s. In 1992, a white co-worker, Colleen Delpeninno, allegedly called Williams a "f-cking black bastard." Plaintiff reported the incident to his manager and filed a complaint with the New York State Department of Human Rights ("NYSDHR"), which dismissed the case for lack of probable cause.

_____

judicial economy, plaintiff's motion to consolidate the actions under docket number 06-CV-5085 is appropriate.

Def. Exh. B, Williams Dep., p. 416.  On July 4, 1994, plaintiff made an internal complaint against a white BA supervisor, Sally Petrosovics, for allegedly calling him "boy" and stated that he should "know his place."  Williams Aff. ¶30.  The company investigated the incident and concluded that Williams had been "insubordinate."  Def. Exh. A, Letter from Larry Jones, Manager of Administration to Williams dated Oct. 28, 1994, D01147.  Ms. Petrosovics also received a letter stating she had used inappropriate language.  Def. Exh. B, Williams Dep., p. 114.  On November 9, 1994, plaintiff filed a NYSDHR complaint, which was later dismissed for lack of probable cause.

Around the same time, plaintiff alleges that unidentified BA personnel put "[a] black doll from the lounge hanging with a string around its neck in the special services office."  Def. Exh. B, Williams Dep., p. 419.  *See also* Def. Exh. K, Dep. Of Roma Klass, BA Customer Services Agent, p. 139.

Plaintiff also alleges that BA supervisor, Bob Schiafano, referred to another black employee as "HNIC," an acronym for "Head Nigger in Charge," and on one occasion told plaintiff that he could "smile now because I [plaintiff] know I am not at the back of the bus."  Def. Exh. B, Williams Dep., p. 410.  Both times, plaintiff complained to another supervisor, who said he would "follow up."

On January 12, 2001, plaintiff slipped and fell in the

employee parking lot of United Airlines at JFK Airport.  The accident was immediately reported to the manager on duty. Plaintiff thereafter received treatment for his injuries.

On January 29, 2001, plaintiff's physician, Dr. Anthony J. Spataro ("Dr. Spataro"), submitted a Physician's Release to Return to Work form to Work & Well, a medical organization providing case management services to BA.[4]  Dr. Spataro diagnosed a "cervical neck sprain" and stated that Williams could return to light duty, that he could sit, stand, or walk for 6-8 hours, but that he could not lift, carry, climb, bend, grasp or handle anything.  Def. Exh. A, D00870.  On March 9, 2001, Dr. Spataro submitted another release, stating that Williams could return to light duty, but could lift no more than 20 pounds.

Plaintiff returned to work on March 12, 2001.[5]  He was rostered to work in the Terraces Lounge (the "Lounge"), the first class passenger lounge.  His duties involved sitting at the front desk and greeting passengers as they entered.  On March 16, 2001, plaintiff was assigned to Immigration, where he checked passengers' travel documentation, Def. Rule 56.1 Statement, ¶¶ 59-62, and "remov[ed] bags from the carousel and [took] them to

---

[4] Work & Well "helps the individual make appointments, follows their treatment regarding their care follow-up, helps them to . . . see doctors in a more timely manner, and . . . help[s] facilitate their return to work." Deposition of Daniel Driscoll, Director of Labor and Employee Relations at BA, Def. Exh. F, p. 50.

[5] Defendant states that Williams returned to work on March 13, 2001.

baggage services."[6]  Williams Aff., ¶ 14.  He was also assigned to Queue, where he directed passengers to their flights.  Def. Rule 56.1 Statement, ¶¶ 59-62.  That same day, on March 16, 2001, plaintiff's co-workers had to escort him from the workplace because his back gave out and he could not stand or walk without assistance.  Williams Aff., ¶ 15.  Dr. Spataro determined that plaintiff's disability at that time was "total, not working." *Id.*

Plaintiff did not work from March 16, 2001 through June 22, 2001.

In an Independent Medical Examination Report ("IME") conducted by Work & Well, Dr. Philip Harris, a physical medicine and rehabilitation specialist, opined that following a month-long treatment, plaintiff "should be able to return to work in a light duty position where he has the ability to change off between walking and sitting."  Def. Exh. M, D02398.  Dr. Harris stated that plaintiff would be "fit for temporary alternate duty" from July 6, 2001 and could return to "full duty without restrictions" on August 6, 2001.  Def. Exh. M, D02399.  On June 22, 2001, plaintiff's physician, Dr. Spataro, released him to work on light duty as of June 25, 2001, with the restrictions of "no walking, standing or lifting."  Def. Exh. A, D00459.

---

[6] Defendant denies that plaintiff had to remove and carry bags while working for Immigration.

On June 25, 2001, Williams returned to work.[7]  Up until August 15, 2001, he was rostered in either the Lounge or Documentation and Paging, both positions plaintiff said he could perform despite his injury.  From August 22, 2001 until October 3, 2001, Williams was rostered to the Lounge.

On October 4, 2001, after plaintiff tripped on a carpet at the BA terminal, Dr. Spataro stated that "[p]atient is unable to work until further notice."  On October 18, 2001, Dr. Spataro released him to work, restricting him to "no lifting, no standing, minimal walking."  Def. Exh. A, D00432.  Between October 22, 2001 and February 9, 2002, Williams was primarily rostered to the Lounge.

On January 7, 2002, plaintiff underwent another IME, in which the doctor reported that plaintiff "could work at a sedentary type of occupation not requiring him to stand all day long, bend forward or carry any objects more than 5 or 10 pounds."  Def. Exh. A, D00395.  Following the IME, BA Performance Manager Joe Brooks ("Brooks") requested that plaintiff begin working at the Check-In counter for short periods.  BA offered him a chair (including back support and arm rests) so he would not have to stand and Baggage Service Agents to tag and lift baggage for him.  *See* Def. Exh. A, D00396, D02758.  Williams was

---

[7] Williams would have been eligible for Long Term Disability had he remained totally disabled through July 17, 2001.  *See* Def. Exh. A, Email from BA Human Resources Assistant, D00847.

rostered to Check-In on the mornings of February 9, 10, and 11, 2002, and subsequently moved to the Lounge.

On February 14, 2002, Dr. Spataro cleared Williams to return to work on February 25, 2002. From February 25, 2002 to March 5, 2002, plaintiff was rostered to work in the Lounge. Between March 7, 2002 and July 12, 2002, Dr. Spataro submitted several forms to Work & Well stating that Williams was unable to work until his next evaluation.

On June 10, 2002, Dr. Aric Hausknecht, another of plaintiff's physicians, submitted a Physician's Release to Return to Work form, stating that plaintiff was "fit for temporary alternate duty from 6/10/02" and that plaintiff could lift five pounds. Def. Exh. A, Physician's Release to Return to Work form, D02717. On July 30, 2002, Williams underwent another IME, from which Dr. Koval concluded that plaintiff could return to work provided he did not lift anything exceeding 10-15 pounds. Brooks sought clarification via a facsimile dated August 2, 2002 from Dr. Spataro regarding the conflicting doctor's assessments. Dr. Spataro did not respond other than to submit another form stating that the patient was unable to work.

Based on the results of the July 20, 2002 IME, Brooks wrote to plaintiff requesting that he return to work on August 14, 2002 and that the company was "prepared to make the necessary accommodations and follow th[e] current restriction as outlined

in the fitness for duty examination to facilitate your immediate

return to the workplace."[8] Def. Exh. A, Letter from Brooks to

Williams dated Aug. 12, 2002, D00380. On August 14, 2002,

plaintiff, accompanied by Doreen Willaum, a union official, met

with Brooks. Williams presented notes from three doctors to

controvert the IME findings. Brooks did not debate William's

medical condition, but noted the Company's position based upon

the IME. Def. Exh. A, Email from Brooks to other BA Managers,

D00381.

Williams testified that when he returned to work on August

15, 2002, he was assigned to the check-in counter. Although a

chair had been provided, the chair was not suitable for the

counter, so he stood. When no baggage services agent was

available, he lifted several bags exceeding 50 pounds.[9] After two

---

[8] BA' employment guidelines state that:

> [w]hen you are released by your physician and/or an Independent
> Medical Examiner (IME) to return to work on a limited or regular
> duty basis, you should return to work immediately. Following your
> return to work, you should . . . be prepared to work any assigned
> limited duty position which is available and that you are capable
> of performing.

Def. Exh. I, BA Employment Guideline No. 19, D02809. Douglas Caines, BA
Director of Customer Service, testified that his "understanding is that
British Airways will make decisions based on the IME." Def. Exh. E, Caines
Dep., p. 80. Doreen Willaum, a BA Customer Service Agent and union official,
affirmed this understanding. *See* Def. Exh. J, Willaum Dep., p. 62. Daniel
Driscoll, also testified that BA "would try to work through [the employee's]
own physician and the medical examiner to see if we could provide more
information that would allow that person to return to work." *See* Def. Exh. F,
Driscoll Dep., p. 35.

[9] While defendant denies that plaintiff had to stand and lift baggage,
defendant does not offer evidence establishing that plaintiff had a suitable chair
and baggage service agents assisting him on this particular day. Defendant cites
to correspondence dated January and February 2002, in which BA' managers discussed

hours, he complained of pain and was assigned to the Lounge. *See* Def. Exh. B, Dep. Of Gary Williams, p. 355-56.  At the Lounge, plaintiff complained of pain in his lower leg and was taken to the Jamaica Hospital Emergency Room.  He was advised not to work for seven days.  Williams, however, wrote to Brooks on August 18, 2002, that he would continue to "report to work in order to protect his employment" and on the advice of the union. *See* Def. Exh. A, Letter from Williams to Brooks, D02684; Def. Exh. B. Dep. Of Gary Williams, p. 365.  On August 21, 2002, Brooks wrote to Williams, noting that the Jamaica Hospital report permitted him to return to work on August 22, 2002 and that "British Airways is prepared to make the necessary accommodations to facilitate your immediate return to the workplace.  As such, you are expected to return to work as scheduled."  Def. Exh. A, Letter from Brooks to Williams, D00379.

On September 3, 2002, Williams filed a complaint with NYSDHR, alleging violations of Title VII and the ADA by defendant BA.  Williams worked a total of four days thereafter, rostered to Check-In, Lounge/Immigration, and Kiosk/Self-Service. *See* Def. Rule 56.1 Statement, ¶ 153.  Plaintiff's last date on BA's payroll was October 1, 2002.

From March 2001 to September 2002, plaintiff was rostered to

---

modifying plaintiff's working conditions at Check-In so that plaintiff would have a chair and baggage service agents to lift and tag baggage. *See* Def. Exh. A, Email from Brooks to Driscoll and Caines, D00396; Def. Exh. A, Email from Jim Smith to Brooks, D02758.

work 130 days.  He was rostered to the Terraces Lounge for 83

days, Documentation & Paging for 39 days, Queue for one day,

Kiosk/Self-Service for one day, and   six days in Check-In.  On

two of the six days in Check-In, plaintiff was moved to the

Terraces Lounge.  On another day when plaintiff was rostered to

Check-In, plaintiff's name on the roster was crossed out,

suggesting that he did not actually work that day.  Def. Rule

56.1 Statement, ¶ 193.

On October 11, 2002, BA approved Williams' request to be

placed in the company's voluntary leave of absence ("LOA")

program.[10]

On November 1, 2002, Williams filed another complaint with

the NYSDHR, alleging violation of the Family Medical Leave Act

("FMLA"), failure to provide him with reasonable accommodation,

and a hostile work environment based upon his race and

disability.

On February 5, 2003, Daniel Driscoll ("Driscoll"), Director

of Labor and Employee Relations, wrote to plaintiff suggesting

that plaintiff "may wish to consider alternative jobs available

within the organization."  Def. Exh. A, Letter from Williams to

Driscoll (quoting Driscoll letter dated Feb. 5, 2003), D00334.

On October 27, 2003, the NYSDHR dismissed both plaintiff's

---

[10] BA established the LOA program after September 11, 2001. The program was intended "to achieve reductions in manpower during a lull in business as opposed to a layoff scenario."  Def. Exh. E, Dep. Of Douglas Caines, BA Customer Service Director, p. 173.

September 3, 2002 and November 1, 2002 complaints.  Def. Exh. S,
NYSDHR Determination and Order after Investigation, No.
16GA203174, D01547-481; Def. Exh. A, NYSDHR Determination and
Order after Investigation, No. 16GA303065, D00708.

On December 22, 2003, the Equal Employment Opportunity
Commission (EEOC) dismissed plaintiff's EEOC Charge, adopting the
findings of the NYSDHR regarding plaintiff's two complaints.

On January 23, 2004, Driscoll wrote to Williams because
Williams did not report for work as instructed after his leave of
absence expired on December 31, 2003.  Driscoll informed Williams
of a meeting on January 28, 2004 to clarify plaintiff's current
employment status and any misunderstanding.  Def. Exh. A, Letter
from Driscoll to Williams, D00337.  Approximately one hour before
the meeting, plaintiff sent Driscoll an email stating that he
could not attend the meeting because of pain due to his injuries.
Def. Exh. A, Email from Williams to Driscoll, D00352.  Caines
rescheduled the meeting for February 5, 2004, and informed
Williams that failure to attend would be understood as an
abandonment of his job leading to employment termination.  Def.
Exh. A, Letter from Caines to Williams, D02504.

On January 31, 2004, plaintiff wrote two letters to
Driscoll, stating that he was "anxious to return to work" and
requesting reasonable accommodation for his injuries.  One of
these letters responded to the letter Driscoll sent to plaintiff

on February 5, 2003, in which Driscoll suggested that plaintiff consider jobs apart from Customer Service Agent. Plaintiff asked that Driscoll provide specific descriptions of current jobs available so that he could check them with his doctor.

On February 5, 2004, plaintiff met with Driscoll, Caines, and Michael Mianzo ("Mianzo"), Chairperson of Shop Stewards for the union. Plaintiff informed BA that he would not be able to return to work in any capacity despite the numerous accommodations offered and that he would not return to work without specific release by Dr. Spataro. BA confirmed with plaintiff that "[c]ompany policy provides that after an [IME] determines that you are fit to return to work, you are required to return to work and failure to do so may result in your termination." Def. Exh. A, Letter from Driscoll to Williams, D00344. The parties agreed to meet again on February 19, 2004. On the same day, February 5, 2004, plaintiff filed this lawsuit.

On March 29, 2004, Caines, BA's Customer Service Director, wrote to plaintiff, informing him that he was expected to return to work after his leave ended on April 13, 2004. Plaintiff responded that he could not return to work because of scheduled surgery. Def. Rule 56.1 Statement, ¶ 177. On April 20, 2004, Caines wrote to plaintiff requesting that he submit a new leave

of absence form in compliance with employment regulations.[11]

Driscoll wrote to plaintiff on April 29, 2004 in response to letters plaintiff sent to Caines in mid-April. Driscoll told plaintiff to contact Caines if he was interested in alternative positions. Def. Exh. A, Letter from Driscoll to Williams, D02531. Plaintiff testified that he did not bid on the alternative positions because they were "non-union positions." Def. Exh. B, Dep. Of Gary Williams, p. 516.

Plaintiff underwent back surgery on July 30, 2004. Although plaintiff's doctors reported that plaintiff was totally disabled and "should not yet return to work," *see, e.g.,* Def. Exh. A, Letter from Dr. Cammisa dated November 5, 2004, D00290, plaintiff testified that he could have worked if given reasonable accommodation. Def. Exh. B, Dep. Of Gary Williams, p. 29. Plaintiff did not contact BA after his surgery. *Id.* p. 26.

On September 27, 2004, Caines wrote to plaintiff again, stating that the company had made several unsuccessful attempts to contact him regarding his leave of absence. Def. Exh. A, Letter from Caines to Williams, D00297. By letter dated January 14, 2005, Caines again requested that Williams return a leave of absence form. Caines further wrote that, "[i]f you continue to ignore my direct instructions and Company policy, I must assume

---

[11] Caines specifically referred to Employment Guideline No. 5, which provides, *inter alia*, that "[n]o leave of absence will begin until the leave application form has been actioned and approved by the Department Head and the People Department." Def. Exh. I, BA Employment Guidelines, No. 5, D02798.

that you have chosen to abandon your employment relationship with British Airways." Def. Exh. A, Letter from Caines to Williams, D02572.

Williams returned the form without filling in the period of leave. Def. Exh. A, D02571.

On March 25, 2005, the parties met for a conference with Magistrate Judge Gold, who directed the parties to explore plaintiff's return to work. Williams underwent another IME on May 3, 2005, in which Dr. Kenneth E. Seslowe, an orthopedic surgeon, concluded that plaintiff "has a moderate partial disability . . . . He cannot do bending or lifting of more than 20 pounds." Def. Exh. C, Evaluation of Dr. Seslowe, D02833. In his June 20, 2005 addendum, Dr. Seslowe reported that plaintiff could work as a customer service agent because "there is only slight or minimal bending or lifting" involved. Def. Exh. C, Addendum of Seslowe Evaluation, D02856.

On May 23, 2005, defendant's counsel wrote to plaintiff's counsel noting that plaintiff had not yet submitted a letter as instructed by the magistrate judge regarding the prospects for plaintiff's return to work. On June 7, 2005, plaintiff's counsel wrote that "Mr. Williams will return to British Airways at the Terrace Lounge Desk if British Airways will reasonably accommodate him, will not have him bending and lifting and do not harass him as he alleged that they have done in the past."

On June 17, 2005, plaintiff's surgeon, Dr. Cammisa, provided a release to return to work form prescribing no "pushing, pulling and lifting from below waist" and "ability to change position frequently every 20-30 minutes." Def. Exh. C, Physician's Release to Return to Work submitted by Dr. Cammisa, D02860.

Defendant's counsel responded to the letter from plaintiff's counsel, as well as the doctor's reports, on June 27, 2005, stating that "Mr. Williams will only be asked to work in positions . . . that reasonably accommodate his condition." Besides the Lounge, "there are a number of other positions that will fully and reasonably accommodate Mr. Williams." The letter then proceeded to list those positions. Def. Exh. Q, Letter from Steven Eckhaus to Mark Drummond.

On June 29, 2005, Terry Hennessy ("Hennessy"), BA Director of Customer Service, requested that plaintiff return to work on July 15, 2005. Dr. Cammisa again released plaintiff to work on July 13, 2005, with primarily the same restrictions as the previous release.[12] On July 14, 2005, plaintiff's counsel wrote to BA, allowing that "Baggage Services is feasible, provided Mr. Williams is restricted to answering the phones and is truly allowed to work within the confines of his medical restrictions." Def. Exh. Q, Letter from Crawford to Eckhaus. Defendant's

---

[12] The only additional restriction was that plaintiff be permitted to "sit or stand at will."

counsel responded the same day, stating that "British Airways intends to accommodate Mr. Williams by honoring the restrictions upon his scope of work duties, as outlined in [the doctor's release] and [his] most recent IME of May 3, 2005. Counsel further wrote that "Mr. Williams and Mr. Hennessey will meet in order to discuss those functions . . . which Mr. Williams is capable of performing." Def. Exh. C, D02867.

On July 15, 2005, Dr. Cammisa sent a letter stating that Williams could not "return to work until re-evaluation on 8/10/05." Dr. Cammisa testified that he wrote the letter at plaintiff's request and that the letter did not result from an examination. Def. Exh. V, Dep. Of Dr. Cammisa, p. 51. Plaintiff did not return to work on July 15, 2005.

Hennessey wrote to plaintiff on July 29, 2005, instructing him to return to work on August 1, 2005, warning that failure to report would be considered an abandonment of his job. Def. Exh. C, Letter from Hennessey to Williams, D02870-71.

On August 25, 2005, BA received an evaluation from Dr. Cammisa, stating that plaintiff's expected duration of treatment was "undetermined" and that his next appointment was in six months. Def. Exh. C, Evaluation from Dr. Cammisa to Work & Well, D02873A. The doctor wrote in an attached letter that Williams could return to work in a sedentary position and start on a part-time basis.

On August 26, 2005, Hennessey again wrote to plaintiff, stating that BA was willing to accommodate plaintiff in compliance with plaintiff's surgeon's work release and the IME dated June 20, 2005. Def. Exh. C, Letter from BA to Williams, D02826. He directed plaintiff to report to work on August 29, 2005 when they would discuss whether he should work on a full-time or part-time schedule. Hennessey again stated that if Williams failed to report to work, BA reserved the right to terminate plaintiff's employment. *Id.* Williams did not return to work on August 29, 2005.

On September 1, 2005, Williams telephoned Performance Manager, Jeffrey Wright ("Wright"). They discussed the details of plaintiff's return to work. Plaintiff said he would come to the terminal "to pick up his paperwork and to get measured for his uniform" the week beginning September 5, 2005. *Id.* Plaintiff states (and defendant disputes) that moments after he spoke with Wright, Hennessey called plaintiff, and told plaintiff that he should have discussed returning to work with Hennessey, not Wright. He said that plaintiff would face charges for job abandonment and hung up the phone. Williams did not appear at the terminal the week beginning September 5, 2005.

On September 6, 2005, Dr. Cammisa faxed a letter to BA, authorizing Williams to return to work "in a sedentary position desk working, computer work or doing paper work" as of October 3,

2005.  The next day, Wright informed plaintiff that "as a result
of your continued absence from work," a hearing had been
scheduled to address plaintiff's alleged violations of the CBA
and the employment guidelines.  Plaintiff's counsel wrote on
September 12, 2005, requesting that plaintiff be accommodated in
accordance with the specifications outlined in Dr. Cammisa's
August 26, 2005 deposition.  These specifications included "a
sedentary position, providing him with an ergonomic chair,
limiting his walking . . ., returning him to part time duty . . .
and allowing him to have the necessary rehabilitative therapy."
Def. Exh. Q, Letter from Crawford to Eckhaus.  BA granted a
request by Manzo, Chairperson of Shop Stewards of the Union, to
postpone the hearing to September 21, 2005.  In an e-mail dated
September 16, 2005, defendant's counsel replied to plaintiff's
counsel's e-mail of September 12, 2005, stating that both the
Performance Manager and the Customer Service Director had assured
plaintiff that BA would accommodate his medical restrictions and
that a position in which he could be accommodated was available.

On September 21, 2005, the date of the hearing, plaintiff
sent Manzo an e-mail, stating that he could not attend because of
his "medical condition and as well as appointment booked for
today."  Def. Exh. A, D02915.  The hearing on September 21, 2005
proceeded without plaintiff, although he was represented by
Manzo, his union representative.

On September 28, 2005, the parties appeared before Magistrate Judge Gold, who asked that Williams appear on the following day to continue settlement discussions. Plaintiff did not appear and could not be reached by telephone.[13]

On September 29, 2005, the Hearing Officer who had presided over the September 21 hearing issued his written decision terminating plaintiff's employment for "failure to report to work and continued absence from work." Def. Exh. C, D02792-93.

---

[13] Federal Rule of Evidence 408 provides in relevant part that "conduct or statements made in compromise negotiations regarding the claim..." are not admissible "on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed. R. Evid. 408(a)(2). Under Rule 408(b), "this rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a)." I take note of plaintiff's objection to the consideration of the settlement discussions under the Federal Rules of Evidence, *See* January 30, 2007 Transcript, Letters from Roosevelt Seymour, dated February 7, 2007 and September 20, 2007. However, settlement discussions may be considered in the ADA context for the purpose of assessing a party's participation in the interactive process. *See, e.g., Matzo v. Postmaster General*, 685 F.Supp. 260, 264 (D.C. 1987).

Williams states in his affidavit dated February 10, 2007 that

On September 28, 2005, I was present for a settlement conference in the Chambers of Magistrate Judge Steven Gold. At the settlement conference my attorneys argued, as I requested, for my return to employment with British Airways with accommodation as a condition of any settlement. However, British Airways refused and only offered me monetary compensation conditioned upon my resignation. I requested and received twenty-four hours to consider the offer of resigning from a position from which I have worked for fifteen years.

If I had been offered a specific position at British Airways that accommodated my disability as a part of a settlement offer I would have accepted it immediately.

In fact I had submitted a letter to British Airways, indicating that I would return to work on October 3, 2005 . . . .

**DISCUSSION**

This Court has jurisdiction over this action pursuant to 28
U.S.C. § 1331.

A court must grant a motion for summary judgment if the
movant shows that "there is no genuine issue as to any material
fact" and that "the moving party is entitled to a judgment as a
matter of law." Fed. R. Civ. Pro. 56(c). Summary judgment is
appropriate "[w]hen the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party."
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.
574, 587 (1986). "An issue of fact is genuine if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party." *Elec. Inspectors, Inc. v. Village of East
Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when
it "might affect the outcome of the suit under the governing
law." *Id.*

The party seeking summary judgment has the burden of
demonstrating that no genuine issue of material fact exists. *Apex
Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order
to defeat such a motion, the non-moving party must raise a
genuine issue of material fact. Although all facts and
inferences therefrom are to be construed in the light most
favorable to the non-moving party, the non-moving party must
raise more than a "metaphysical doubt" as to the material facts.

*See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). "The salutary purposes of summary judgment-- avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to...other areas of litigation," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) and courts have often noted that it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).

Plaintiff alleges violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq,*[14] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. ("Title VII"),[15] and 42 U.S.C. § 1981.[16]

*ADA Claim*

Plaintiff claims that defendant discriminated against him due to his disability by failing to provide reasonable accommodation.

In order to establish a prima facie claim of disability discrimination under the ADA for failure to provide reasonable accommodation, a plaintiff must establish that:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable

---

[14] Under the Americans with Disabilities Act, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges of employment."  42 U.S.C. § 12101.

[15] Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.
Title VII also makes it unlawful for an employer "to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3.

[16] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

accommodation, plaintiff could perform the essential
functions of the job at issue; and (4) the employer has
refused to make such accommodations.

*Rodal v. Anesthesia Group of Onandago, PC*, 369 F.3d 113, 118 (2d
Cir. 2004).

Under the ADA, reasonable accommodation may include "making
existing facilities used by employees readily accessible to and
usable by individuals with disabilities" and "job restructuring,
part-time or modified work schedules, reassignment to a vacant
position, acquisition or modification of equipment or devices . .
. ." 42 U.S.C. § 12111(9). In order to make out a prima facie
case of failure to accommodate, plaintiff must show that
defendant refused to make a reasonable accommodation. *See
Mitchell v. Washingtonville Central School Dist.*, 190 F.3d 1, 6
(2d Cir. 1999). The defendant is not required to provide any
particular accommodation plaintiff requested, "only some
accommodation, as long as it was reasonable." *Picinich v. United
Parcel Service*, 321 F.Supp.2d 485, 510-11 (N.D.N.Y. 2004)(citing
*Fink v. New York City Dep't of Personnel*, 53 F.3d 565, 567 (2d
Cir. 1995)). Moreover, the ADA contemplates employees and
employers working together in "an informal, interactive process .
. . , [which] should identify the precise limitations resulting
from the disability and potential reasonable accommodation that
could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).
While plaintiff has the burden of identifying an accommodation,

the defendant-employer must take affirmative steps to assist the plaintiff in this process. *See Picinich*, 321 F.Supp.2d at 511; *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 568 n.4 (2d Cir. 2000). "Failure of an employer to act in good faith will preclude summary judgment against an employee on a claim of failure to accommodate." *Picinich*, 321 F.Supp.2d at 511 (citation omitted). "However, where an employer makes reasonable efforts to communicate with an employee, liability under the ADA will not attach, and likewise, where the employee causes the interactive process to collapse, the employer will not be liable." *Picinich*, 321 F.Supp.2d at 511 (citing *Donofrio v. New York Times,* 2001 WL 1663314 at *6-7 (S.D.N.Y. 2001), adopted by the District Court, 2002 WL 230820 (S.D.N.Y. 2002); *Economou v. Caldera*, 2000 WL 1844773 at *23-24 (S.D.N.Y. 2000)).

Given the undisputed facts shown here and drawing every inference in plaintiff's favor, no reasonable juror conclude that defendant British Airways failed to take reasonable steps to accommodate plaintiff's disability. Over the course of three years, defendant BA made numerous efforts to communicate with Williams, repeatedly offering to accommodate plaintiff both within his current position and offering him opportunities to consider other positions within the company. Plaintiff did not respond in a timely manner and, when he responded, he demonstrated a lack of commitment to the interactive process by

failing to appear for scheduled meetings and hearings and
providing short notice of his absence.  Defendant continued to
assure plaintiff that he could and would be accommodated in
accordance with his medical restrictions, including those set by
his own doctor.[17]  Accordingly, summary judgment on plaintiff's
ADA claims must be granted in favor of defendant.[18]  *See Donofrio*,
2001 WL 1663314, at *7 (granting summary judgment to defendant
because plaintiff failed to show that defendant bore the
responsibility for breakdown of interactive process and that

---

[17] Plaintiff contends that BA' settlement offer requiring him to resign
reflect defendant's bad faith in the interactive process.  Considered together
with defendant's prior repeated attempts to communicate with plaintiff and the
proposed continuation of settlement discussions before the Magistrate Judge
the following day, defendant's settlement offer at the September 28, 2005
conference does not reflect a good faith failure to engage in the interactive
process.  Plaintiff's failure to appear at the continuation of the conference
the next day or communicate with the magistrate judge in a timely fashion
concerning his inability to do so justifies defendant's failure to pursue the
interactive process in light of plaintiff's prior repeated failures.

[18] I note that in a decision issued on December 15, 2006, the New York
State Workers' Compensation Board ("Board") determined that plaintiff had
"voluntarily withdrew from the labor market by refusing the employer's
accommodating ("light duty") job offers."  New York State Workers'
Compensation Board Decision, In Regard to Gary Williams, WCB Case #0011 3093,
dated Dec. 15, 2006, p. 2.  The Board found that "[i]n correspondence dated
June 29, 2005 sent to the claimant [Gary Williams] by certified mail there is
a clear offer of light duty employment based on claimant's restrictions with a
return to work date."  *Id.* p. 1.  Therefore, the Board determined, "[t]he
employer has satisfied their burden of proof in their offer of a genuine and
legitimate offer of employment."  *Id.* The Board's decision was affirmed by the
Workers' Compensation Board Panel ("Panel") on August 31, 2007.  I take note
of plaintiff's objection to the consideration of the Panel's decision
submitted by defendant's counsel on September 18, 2007, *see* Letter from
Roosevelt Seymour, dated September 20, 2007. However, I will consider the
Panel's decision as it affirms the Board decision that was addressed at oral
argument and in subsequent Court requested letter briefings.  While the
Panel's decision is not binding with respect to plaintiff's federal claims,
*see Greenberg v. NYC Transit Authority*, 336 F.Supp.2d 225, 249 (E.D.N.Y.
2004), it further supports a conclusion that a reasonable fact finder would
have to find that defendant sought in good faith to reasonably accommodate
plaintiff.

evidence demonstrated that plaintiff was not working towards an accommodation); *Economou*, 2000 WL 1844773, at *23 (granting summary judgment because plaintiff was responsible for breakdown of interactive process).

*Discrimination Claims*[19]

Title VII prohibits discrimination in employment based on an employee's race or national origin. To succeed on a Title VII discrimination claim, the plaintiff must first offer ". . . evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 (1977). In producing such evidence, a plaintiff establishes a prima facie case, creating a presumption of discrimination which shifts the burden of production to the defendant. The defendant must then present a legitimate, non-discriminatory reason for the adverse employment action to rebut the presumption. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). The burden then shifts back to the plaintiff to prove that the stated reason is pretext, and ". . . that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.

---

[19] "[E]mployment discrimination claims brought pursuant to §§ 1981 and 1983...are evaluated under the same analytical framework as those brought under Title VII." *Jessamy v. City of New Rochelle*, 292 F.Supp.2d 498, 511 n. 15 (S.D.N.Y. 2003)(internal citations omitted). Accordingly, these claims will be addressed together.

2000) (citing *McDonnell Douglas*, 411 U.S. at 802; *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir. 1997)(en banc), cert. denied, 522 U.S. 1075 (1998)).

Plaintiff alleges discrimination based on his race under two theories: (1) creation of a hostile work environment; and (2) disparate treatment.  I address each of these claims below.

The Supreme Court has interpreted Title VII to prohibit ". . . requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)(citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  To succeed on a hostile work environment claim, a plaintiff must show that ". . . the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,'. . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Id* at 21.  Factors to consider in determining whether an environment is hostile or abusive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id* at 23.  Although "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred . . ." they must occur under circumstances in which ". . . the

incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. College of Staten Island*, 2003 WL 21143076, at *2 (E.D.N.Y. 2003)(citing *Gregory v. Daly*, 243 F.3d 687, 694-95 (2d Cir. 2001)). Isolated incidents of offensive conduct are generally inadequate to establish a discrimination claim, and plaintiff must show "either a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted" to cause a change in the work environment. *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation omitted). After establishing that a hostile work environment resulting from discrimination existed, a plaintiff must show that there is a basis for imputing the discriminatory conduct to his employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996).

Plaintiff relies on several incidents of racial discrimination that took place in the 1990s for his hostile work environment claim.[20] The incidents that plaintiff points to were isolated in nature and took place over a number of years, well before plaintiff's termination. None of the incidents was severe

---

[20] Defendant argues that incidents occurring more than 300 days prior to plaintiff's bringing this action are time-barred under Title VII. *See* 42 U.S.C. § 2000e-5(e)(1) (requiring plaintiff to file charge with EEOC within 300 days after allegedly unlawful practice occurred). However, certain incidents, even if time-barred, "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002).

enough by itself to establish a change in the work environment.
Taken together, the incidents described are separated in time and
space and do not demonstrate a change in work environment.
Although Williams may have been justifiably offended by the
interactions with his co-workers of which he complains, "mere
utterance of an ... epithet which engenders offensive feelings in
a employee ... does not sufficiently affect the conditions of
employment to implicate Title VII. *Harris*, 510 U.S. at 21
(internal quotations and citation omitted).  Accordingly, I
conclude that a reasonable juror could not infer that plaintiff
was subjected to a hostile work environment.[21]

Plaintiff appears to argue that defendant discriminated
against him on the basis of his race by failing to accommodate
his disability and in the end, terminating him.  Because
plaintiff cannot show that defendant failed to accommodate his
disability, plaintiff cannot assert racial discrimination under
Title VII or 42 U.S.C. § 1981 based on a hostile work environment
or employment termination because, as discussed below, defendant
has offered a neutral reason for its conduct and his termination

---

[21] Plaintiff offers only one incident implicating his national origin.
At an unidentified point in time, prior to his injury, there was an incident
where flyers about recruiting Jamaicans to the mafia were placed on the wall
in the BA lunch room.  Plaintiff indicates that as a Jamaican, he was offended
by this incident.  Pl. Exh. 19, Williams Dep., p. 424-425.  Plaintiff did not
know who posted the flyers and did not know that BA provided the poster to the
State Division of Human Rights.  *Id.*  This isolated incident does not rise to
such a level that a reasonable juror could infer that there existed a hostile
work environment based on William's national origin.

and plaintiff has offered no evidence that this reason was
pretextual.

A disparate treatment claim arises when there is either (1)
an adverse employment action under circumstances giving rise to
an inference of discrimination based on race; or (2) harassment
on the basis of race that amounts to a hostile work environment.
*See Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004). Since
plaintiff has not established the existence of a hostile work
environment, I focus here on the alleged adverse employment
action claim.

To establish a prima facie case of Title VII disparate
treatment based on adverse employment action a plaintiff must
show (1) that he belonged to a protected class; (2) that he was
qualified for the position he held; (3) that he suffered an
adverse employment action; and (4) that the adverse employment
action occurred under circumstances giving rise to an inference
of discriminatory intent. *Feingold*, 366 F.3d at 152 (internal
citations omitted). An adverse employment action is "more
disruptive than a mere inconvenience or an alteration of job
responsibilities." *Galabya v. New York City Bd. of Educ.*, 202
F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank
& Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)). Examples
of adverse employment actions are "termination of employment, a
demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly
diminished material responsibilities . . ." *Id*.

Once a plaintiff has made out a prima facie case, the
employer is required to offer a legitimate, nondiscriminatory
business rationale for its conduct. *Feingold,* 366 F.3d at 152
(citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant has
stated a neutral reason for the adverse action, "to defeat
summary judgment ... the plaintiff's admissible evidence must
show circumstances that would be sufficient to permit a rational
finder of fact to infer that the defendant's employment decision
was more likely than not based in whole or in part on
discrimination." *Stern v. Trustees of Columbia University in City
of New York*, 131 F.3d 305, 312 (2d Cir. 1997).

Williams has established the first two elements of a prima
facie claim because he is a member of a protected group, defined
by his race, and he was a qualified customer service
representative.  As to the third and fourth elements, Williams
argues that he suffered an adverse employment action on account
of his race, because similarly situated disabled white employees
were either transferred to positions that accommodated their
disabilities or were maintained on light duty positions while as
a disabled black employee he was not accommodated.

In order to be similarly situated, the employees being
compared "must have a situation sufficiently similar to

plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuiness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001). Plaintiff compares himself to several disabled white employees who he alleges were accommodated. Def. Exh. B, pp. 772-777, 780. However, plaintiff concedes that he does not know the nature of his co-workers' disabilities or the accommodation that BA provided them. Def. Rule 56.1 Statement, ¶286, citing Def. Exh. B, pp. 772-777, 780-81. Thus, his comparisons to his disabled white co-workers' disabilities and accommodations consist of conclusions and are not sufficient to withstand a motion for summary judgment. *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).[22]

Although employment termination constitutes an adverse employment action, *see Galabya*, 202 F.3d at 640, there is no evidence in the record to support a finding that plaintiff was

---

[22] Plaintiff also offers testimony from two BA employees to support his claim that he was not accommodated on account of his race. Klass Dep., 71-73; Bailey Aff. 5; Palmer Aff. 8; Pl. Rule 56.1 Statement, ¶¶46-48. Doreen Willaum, shop steward, testified that BA wanted to make thing "uncomfortable for him" and they did not want to "work with" plaintiff and were treating him "differently" from other employees. Pl. Rule 56.1 Statement, ¶¶ 46-47; Willaum Tr. 53. Willaum's statements are her personal opinion and she never verified plaintiff's claims of not being accommodated. Her only involvement in the assignment of duties for disabled workers was as an advocate. Def. Response to Pl. Rule 56.1 statement, Pl. Exh. 20, pp. 77-78. Moreover, Roma Klass, a BA passenger service representative, who also testified in support of plaintiff, is an employee who does not have a supervisory role and was not involved in the reassignment of duties for disabled workers. Thus, she does not have first hand knowledge of BA's accommodation, or lack thereof, of disabled employees. Therefore, the testimony of Willaum and Klauss amounts to speculation and does not withstand a motion for summary judgment. *See Hester v. BIC Corp.*, 225 F.3d 178, 182-85 (2d Cir. 2000).

terminated on account of his race. Defendant gave Williams several opportunities to return to work and offered to accommodate him so that he could resume his old position or pursue other positions within the company. Def. Exh. A, D02530-3; Wright Aff. ¶¶5-10. Defendant also terminated the employment of at least three disabled white employees who failed to return to work after being cleared by IMEs to do so. *See* Def. Rule 56.1 Statement, ¶¶ 281-82 and ¶¶ 284-85 (citing Wright Affidavit ¶¶ 16-20; Pl. Exh. F, Driscoll Dep., pp. 328, 330; and Def. Exh. Y, Villar-Pruneddu's Hearing Documents). Accordingly, plaintiff did not suffer termination on account of his race.

Even if plaintiff had made out a prima facie case of racial discrimination on account of disparate treatment and an adverse employment action, BA has offered legitimate, non-discriminatory reasons for its conduct. BA made efforts to accommodate Williams' injuries in accordance with company policy and in the same manner as they did with similarly situated disabled white employees. *See e.g.,* Pl. Exh. 6, Letter from BA to Villar-Pruneddu (stating that "British Airways is prepared and willing to make the necessary accommodations"); Pl. Exh. 7, IME Report Re: Borgese, p. 4 (restricting patient from lifting heavy objects and reaching); and Def. Exh. Z, employment records for Beres, Borgese, and Liotta, including IME Report for Liotta (restricting strenuous and repetitive use of wrist). Not only did BA offer to

accommodate Williams in his current position, but they also offered him positions in other parts of the company. BA engaged Williams in an interactive process to accommodate his disability and has presented a legitimate non-discriminatory reason for its choices. Plaintiff has provided no evidence that would lead a rational finder of fact to infer that BA's actions were pretextual. Accordingly, plaintiff's disparate treatment claim does not withstand summary judgment.

Plaintiff does not discuss or argue his retaliation claim in his opposing brief. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) (citing *Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 393 (S.D.N.Y. 1998) (collecting cases)); *see also Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 828 F.Supp. 114, 1129 (S.D.N.Y. 1993) (dismissing claim where plaintiff "failed to argue the claim in its post-trial memo or in its response papers once [defendant] had addressed the issues in its own brief"). On this basis alone, the court could grant summary judgment on plaintiff's retaliation claims under Title VII and Section 1981. In any event, given the lack of evidence demonstrating a causal connection between plaintiff's race and his employment

termination,[23] summary judgment is granted in favor of defendant
on those claims.

*State Claims*

In plaintiff's September 17, 2007 action against BA, No. 06-
CV-5085 (with which plaintiff's February 5, 2004 action, No. 04-
CV-0471, has now been consolidated), plaintiff alleges
discrimination and retaliation based on race and disability under
New York Executive Law § 296 *et seq.* Since I have dismissed
plaintiff's federal claims, I decline to exercise jurisdiction
over his pendent state claims. *United Mine Workers v. Gibbs,* 383
U.S. 715 (1966); *Strong v. Bd. of Educ. Of Uniondale Union Free
School Dist.*, 902 F.2d 208, 213 (2d Cir. 1990). *Keady v. Nike,
Inc.*, 23 Fed. Appx. 29, 32 (2d Cir. 2001) (noting that "in the
usual case in which all federal law claims are eliminated before
trial, the balance of factors will point toward declining to
exercise jurisdiction over the remaining state-law claims").

## CONCLUSION

For the reasons set forth above, plaintiff's motion to
consolidate his two actions against defendant under docket number
06-CV-5085 is granted and defendant's motion for summary judgment

---

[23] To establish a *prima facie* case of retaliation, plaintiff must show (1)
that he was engaged in a protected activity, (2) that his employer was aware of
that activity, (3) that he suffered an adverse employment action, and (4) that
there was a causal connection between the protected activity and the adverse
employment action. *Manoharan v. Columbia Univ. College of Physicians & Surgeons*,
842 F.2d 590, 593 (2d Cir. 1998).

is granted in its entirety.

The clerk is directed to enter judgment dismissing the complaint and to furnish a copy of the within to the parties and the magistrate judge.

SO ORDERED.

Dated :   September 27, 2007
          Brooklyn, NY

                    By:   /s/ Charles P. Sifton (electronically signed)
                                United States District Judge